FILED LODGED
RECEIVED
JUN 21 2022
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY DEPUTY

Judge Robart

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| LUKE ELLIOTT SOMMER,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | NO. CR09-257JLR<br>NO. CR09-436JLR<br>NO. CR06-5528FDB |

MOTION FOR REDUCTION IN SENTENCE UNDER 18 U.S.C. §3582(C)(1)(A)(I)

ORAL ARGUMENTS REQUESTED

Luke Elliott Sommer ("Sommer"), moving *pro se*, respectfully submits this motion to the Court requesting reduction in sentence under the First Step of 2018. Sommer is genuinely unsure whether or not this action is subject to the page limits specified under Local Court Rules CR 7(f) and CcR 12(b)(5). The issues driving Sommer's motion for reduction in sentence are complex. By way of example, several of the arguments are predicated on neuroscience studies that have emerged after the commission of his crimes and subsequent sentencing. As a result, a significant degree of background information is needed. In the event the Court finds that this motion is subject to the



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Local Court Rules regarding page limits, Sommer requests that the Court grant him leave to submit this motion at its current page count. Sommer understands that such requests are disfavored, and will attempt to keep this and future pleadings as brief and to the point as possible while being careful to cull redundant and unnecessary text from the documents. In the event the Court denies leave to proceed with this overlength motion, Sommer requests appointment of counsel to assist in preparing a motion that conforms to the expectations of the Court.

## SUMMARY

In deciding Sommer's motion, this Court faces two issues:

**Sentencing Factors:** Sentence reduction under the First Step Act must be consistent with applicable sentencing factors in 18 U.S.C. §3553(a), including the need for the sentence to reflect the seriousness of the offense, avoid unwanted sentencing disparities, provide educational and vocational opportunities, and protect society.

Nearly fifteen years ago, Sommer led a takeover bank robbery in Tacoma, Washington, brandishing a pistol. No one was injured. After Sommer's bank robbery conviction, he assaulted his codefendant and solicited the murder of his prosecutor, inarguably serious conduct. Sommer plead guilty, receiving twenty years consecutive to his first sentence. As a result, Sommer's sentence was extended to a 44-year term. While his conduct was extremely serious, his sentence overstates his offense conduct, weighing in significantly longer than sentences awarded for more serious crimes. Additionally, Sommer is no longer the same man he was at the commission of his offense, and a sentence longer than twenty years is no longer necessary to protect the public.

Sommer has been denied programming opportunities repeatedly over the last fifteen years, most recently when he applied for admission to the Federal Bureau of Prisons ("BOP") Residential Drug Abuse Program ("RDAP"). Because there are limited spaces available for program



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

participation, inmates are prioritized based on their release date, with inmates expecting to release sooner being given priority.

Finally, Sommer does not believe a sentence of less than twenty-years would adequately reflect the serious nature of his conduct. That said, Sommer respectfully submits that a sentence of longer than twenty-years overstates the seriousness of his conduct and does not take into consideration the new science related to youth, trauma and brain development, changes to the U.S.S.G., and Supreme Court precedent that emerged after his offense conduct and sentencing.

Reducing Sommer's sentence to twenty-years would permit him to take needed programming, and ready himself for release. A twenty-year sentence would also adequately reflect the seriousness of his offense and promote respect for the law and deter offenders from criminal activity.

**Extraordinary and compelling reasons for sentence reduction:** In order to reduce Sommer's sentence, he must show that extraordinary and compelling reasons exist.

Sommer was a youthful offender at the time of both of his offenses. New science, unavailable at the time of Sommer's offense, indictment, plea, and sentencing, shows that the average male brain does not fully develop until twenty-five years old. In addition, Sommer's exposure to trauma during his childhood and youth led to him developing Post Traumatic Stress Disorder ("PTSD"), which also affects decision making portions of the brain.

The conditions of Sommer's confinement have been considerably different than anticipated at sentencing, both as a result of the ongoing COVID-19 pandemic, but also because of his family circumstances. When considered in the global context of Sommer's circumstance, these additional factors weigh heavily in favor of his release.

Sommer's extraordinary rehabilitation also provides strong support for his release, decreasing his likelihood of reoffending, or posing a danger to the community. His psychology records,



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

dozens of support letters, and progress report all document a complete change in Sommer's outlook, behavior, and maturity as predicted by modern neuroscience.

When these elements are considered in their totality, it is clear that extraordinary and compelling reasons exist to grant relief.

## STATEMENT OF FACTS

When Sommer was approximately four years old, he was molested by a neighbor, the first chapter in a long history of trauma he endured as a child and a young adult.

In the early nineties, Sommer attended Maple Springs Bible Camp, where he met Amanda MacDonald, who would later become his wife. They started dating when Sommer was fifteen and dated off and on for over a decade.

Sommer started drinking at the age of twelve and drank daily for several years, strongly suggesting a lack of parental supervision and guidance. His Father, Luke Sommer Sr., was harsh, emotionally, psychologically, and physically abusive, and Sommer hated and feared him growing up.

Being homeschooled, Sommer had little opportunity to interact with other kids in any structured social setting. On the few occasions when social opportunities were afforded, they were with other homeschooled children, few of which were his own age. As a result, Sommer was ostracized by the kids in his neighborhood that had more traditional experiences and was routinely bullied.

After nearly twenty years of marriage, Sommer's parents separated. He was fifteen. Initially he stayed with his mother. Unable to fully manage both her divorce and the raising of her five children, she sent him to live with his maternal grandmother where he stayed for several months. When Sommer was brought home by the Royal Canadian Mounted Police ("RCMP") after he was



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

found intoxicated on a freeway median he was sent to live with his uncle, his mother's brother. His uncle worked long hours and had children of his own. As a result, he was unable to provide the discipline and role modeling Sommer required.

Sommer drifted, living with friends and family off and on until receiving parental consent to travel to the United States and join the U.S. Army.

Sommer's girlfriend at the time was pregnant with his son, Landon Sommer-Rose, and he realized he needed to find a job that would allow him to support his family.

Because his father was an American Sommer automatically had U.S. citizenship, enabling him to serve in the U.S. Military.

Sommer was determined to join, but lacking the formal education credentials required, he printed a Home School Diploma and transcripts, which his recruiter had assured him would be sufficient. On the day before his seventeenth birthday Sommer traveled with his mother and maternal grandfather to Bellingham, Washington where they met his recruiter. The next day he enlisted in the United States Army.

The recruiter's information turned out to be accurate; the Army accepted his diploma, admitting Sommer into their ranks with less than five months of lifetime formal education.

Sommer was sent to basic training at Fort Benning, where he was selected as the "Keeper of the Airborne Wings," an honor position awarded to the class's youngest member. While completing the last qualification jump required by the school, his son was born, and Sommer was given leave to spend time with him.

Sommer returned to Fort Benning where he completed the Ranger Indoctrination Program and was assigned to 1st Platoon, Charlie Company, 2nd Battalion of the 75th Ranger Regiment. He was not yet eighteen.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Once he arrived at his unit, Sommer continued to drink heavily; his barracks had a company bar on the second floor and a platoon bar for 2nd Platoon on the third floor allowing young Rangers to drink without risking legal exposure.

Two weeks after his eighteenth birthday, Sommer was deployed to the Green Zone in Baghdad, Iraq, where his roommate Nathan Stahl was killed by an improvised explosive device.

A little over a year later Sommer was deployed to Afghanistan. Shortly thereafter Navy SEAL Petty Officer Marcus Luttrell's recon team was ambushed, resulting in the death of three members of the team.

The Quick Reaction Force ("QRF") functioned as a 911 force for allied forces in contact. At the time the QRF was composed of aircrew from the 160th Special Operations Aviation Regiment ("The Nightstalkers") and members of the Luttrell's SEAL unit. While responding to Luttrell's team's pleas for help the QRF unit was shot down, resulting in the loss of life of everyone aboard the helicopter.

Sommer's Ranger platoon was deployed by land to recover the bodies of the SEALs and Nightstalker personnel. For months Sommer had lived, eaten, and trained with both the Nightstalkers and SEALs. This loss of friends and acquaintances, combined with his adverse childhood experiences, resulted in Sommer developing severe Post Traumatic Stress Disorder ("PTSD"), which Sommer still deals with today.

Upon returning to the United States, Sommer was sent to the United States Army Ranger School, the U.S. Military's premier leadership training course. Sommer passed with flying colors, being nominated for honor graduate after saving the life of a fellow student. Both his mother and grandmother, with whom he was especially close, attended his Ranger School graduation.

Shortly after his return to his unit, two of his friends were killed in training accidents. Sommer struggled with this; he became increasingly erratic and paranoid, displaying irrational behavior and



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

thought processes. Even so, the Army sent Sommer to Emergency Medical Technician training to augment his platoon's medical capabilities at the squad level.

While this helped Sommer somewhat, his behavior was still alarming. After several bizarre phone calls, his mother contacted his First Sergeant in her capacity as a parent and a Canadian Forces officer. After speaking with her, Sommer was punished and instructed not to allow family to insert themselves in the operations of his unit.

Less than three months after returning to base from Ranger School, and fewer than two after turning twenty, Sommer invited several members of his unit and a couple of friends to participate in a bank robbery; such wild schemes were increasingly normal for Sommer, but he'd never actually seen them through.

This time, he did.

Shortly before the robbery, Sommer's grandmother slipped into a coma. Sommer discovered this after receiving a phone call from his mother informing him she was going to die.

Numb, Sommer went through the motions the conspirators had discussed, preparing the armor, weapons, and other equipment and ultimately leading them into the bank. As soon as the robbery was completed, Sommer tied up his responsibilities with his unit, signed out for two weeks leave, and then travelled to Canada to say goodbye to his grandmother.

She died that night.

In a daze, Sommer matter-of-factly told his mother he robbed the bank, then walked out of the hospital. He spent the next several days intoxicated before being taken into custody by the RCMP. Sommer was held in Canadian custody pending extradition. He was release to house arrest where he absconded and was returned to close confinement pending his return to the United States.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Once he was returned to the United States, Sommer was sentenced by the honorable Franklin D. Burgess to 288 months in prison. Distraught at the length of imprisonment he had received, Sommer became increasingly nihilistic and bitter.

While at the Federal Detention Center at SEATAC, Sommer assaulted his codefendant (Nathan Dunmall). They were moved to the Special Housing Unit. Neither Sommer, nor his codefendant, required hospitalization. While in the Special Housing Unit Sommer solicited the murder of his prosecutor, Michael Dion. When Sommer discovered he had been setup he immediately plead to 240 months before this Court for both the assault and the solicitation to commit a crime of violence charges, waiving the right to indictment on the charge of solicitation.

Bringing the same self-destructive mindset to prison that Sommer had been displaying leading up to his convictions and sentencing, Sommer was easily influenced upon arrival in prison. He was exposed to heroin, and quickly became an addict. He continued using in order to deal with his anxiety, frustration, and hopelessness. He drank but transitioned away from alcohol as he began to rely more and more on opiates as a coping mechanism.

Sommer had numerous disciplinary infractions during the first eleven years of his incarceration. His infractions include fighting and assault with serious injury (both for his assault on Nathan Dunall over thirteen years ago), and substance abuse.

In 2011, Sommer arrived at United States Penitentiary ("USP") McCreary, where he was almost immediately assaulted. He didn't fight back and was returned to general population. Two years later, he married Amanda MacDonald. They remain happily married. Because of his mental health issues, Sommer was required to consult with the Psychology Services Department before being allowed to marry.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer's disciplinary history and mental health conditions were serious, but everything started to change following the death of his nephew and treaty transfer denial in 2016. In 2013 Sommer had applied for a "treaty transfer" that would have allowed him to serve the remainder of his sentence in Canada. In 2015, after waiting more than two years, he received final approval. He was understandably excited, not only because such a transfer would have qualified him for near-immediate release, but also because it would have allowed him to meet his terminally ill nephew.

Sommer's drug problem and failure to comply with mental health treatment derailed that completely. After being moved to SEATAC from USP Terre Haute, Sommer learned that his transfer had been canceled based largely on institutional conduct. The BOP transported Sommer back to USP Terre Haute where Sommer learned of his nephew's death. Sommer went on a binge, spending months getting high on a daily basis, before getting assaulted for a second time. He spent thirty days in the Special Housing Unit before being shipped.

Sommer knew he needed to get sober, but drugs and alcohol had been such a substantial coping mechanism for so long that he had no idea where to start.

Frustrated by the feeling of helplessness, Sommer doubled down on his behavior. During the period of 2016-2018, Sommer spent well in excess of a thousand dollars a month, money that was not his, putting enormous strain on his friends and family.

After numerous conversations with his wife, mother, and close friends, Sommer finally took the steps needed to get help. Sommer enrolled in the Challenge program in 2019. Challenge is a Cognitive Behavioral Therapy ("CBT") program that addresses addiction and mental health issues. He had been previously denied Residential Drug Abuse Program placement because of the length of his sentence but was referred to Challenge.

The program saved his life.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

After seven months of intense struggle, Sommer managed to get sober. Still, he was expelled; he had spent months unable to fully commit to treatment and his eleventh-hour sobriety wasn't enough to convince the staff that he was worth keeping in the housing unit.

Sommer was sent to a general population housing unit. He took his sobriety with him and spend the next several month finding employment in the Education department, taking custodial maintenance courses, and volunteering in food service for the Passover meals.

In April 2020, Sommer's institution went into modified operations in response to the COVID-19 pandemic that, as of late spring of 2022, have not been fully lifted. These restrictions impact programming, recreation, and activities that he would reasonably have been expected to be able to participate in by this Court at the time of sentencing.

Sommer is fully vaccinated and has taken the booster shot. He washes his hands frequently and wears a mask properly. Despite the COVID-19 restrictions, Sommer enrolled in college courses from Thompson Rivers University, to make the most of the time being spent in his cell. He completed a math course (Calculus I) with an A grade.

With no end to the pandemic in sight, and after speaking with friends and family members, Sommer decided to return to the Challenge program.

Sommer returned to the Challenge program in December of 2020, this time with over a year of sobriety and a completely different attitude. Over the course of the next eighteen months, Sommer earned the respect of staff and inmates, established himself as an asset to his community and his own treatment, and became a role model for the other members of the Challenge housing unit.

Sommer was hired in the prison's education department as a GED tutor, and during the Passover holiday he volunteers in food service. While working in the food service department,



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer received outstanding evaluations stating that "[n]o supervision was required. [Sommer was] [c]ompletely dependable in all things," and performed "[s]uperior work." In the comments, the officer wrote that, "Inmate Sommer was a great addition to the detail during this time and was very helpful."

In addition to demonstrating and practicing integrity in his off time, Sommer also helped organize and maintain a donation library on this housing unit.

In peer-to-peer interaction, Sommer has welcomed new participants to the Challenge living unit and helped familiarize them with the rules and expectations of the program. He also actively demonstrates his responsibility as a good citizen by directly providing his peers with constructive suggestions, or by holding them accountable through formal channels.

Sommer's family relationships also improved. He spends time with his son on the phone assisting him with his homework and encouraging him to avoid making the same mistakes he had when he was a young man.

Sommer is also working on completing his college education. He enrolled in a Bachelor of Science program at California Coast University, with a declared major in psychology. He has completed over 1,500 hours of educational, psychological, recreational, and vocational training including a 150-hour Custodial Maintenance certification program, the 240-hour GED program, more than 500 hours of Challenge programming, and a 150-hour Microsoft Office 2010 credential. Above and beyond those larger programs, Sommer has also completed college classes and more than twenty certificate programs. He has also taught re-entry classes including resume clinics. This has allowed him to develop job skills that will assist him in re-entering society.

Sommer has also been hired as an Inmate Companion. Inmate Companions are tasked with serving as the first line of defense for institutional suicide prevention. They monitor inmates on



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

suicide watch in observation cells in the Health Services department, ensuring that inmates do not harm themselves, and inform staff in the event of an incident. Inmates hired for this position must be, in the program coordinator's judgment, mature, reliable individuals who have credibility with both staff and inmates. They must be able to protect the suicidal inmate's privacy from other inmates while being accepted in the role by staff. Finally, they must be able to perform their duties with minimal need for supervision.

Sommer was also asked to live with an inmate with serious mental health issues. After a treatment team meeting with the acting Challenge program coordinator and two treatment specialists, Sommer was assigned to live with the inmate. Sommer accepted the challenge. This decision is just one example of his improvement in the areas of humility, caring, honesty, and gratitude. His duties were to serve as a friend, mentor, emotional support, and role model for maintaining the daily expectations of life in the Challenge program unit.

Shortly after being selected for that responsibility, Sommer was hired as a Psychology Peer, one of only three inmates in his institution to be selected for this position. In this role, Sommer works with inmates suffering from mental illness and helps them learn, practice, and use the coping skills taught in the Challenge program.

In a letter to the participants of the Inmate Companion/Mental Health Companion programs, former BOP director Charles Samuels informed the participants that these programs are ones of which he is particularly proud, adding that he has great respect and appreciation for the work that inmates like Sommer are doing to support their peers through their darkest moments. In closing, the former director reminded the participants that their work has the power to save lives.

Sommer has a substantial amount of community support, evidenced by the dozens of letters written on his behalf, many offering post-release support. Letters from inmates, credit Sommer



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

with providing needed guidance and role-modeling, assisting with their educational pursuits and, in one instance, literally saving their life. The letters from his family show a significant degree of support and deep respect for the changes Sommer has made over the course of the last three-plus years. Staff has similarly positive things to say. The observations and comments of no fewer than nine BOP staff members are contained in the exhibits, describing Sommer as a mentor, leader, role model, and man of character and integrity. Perhaps the best testimony to Sommer's transformation comes from Mercedes Carroll, a retired, 23-year veteran of the BOP who supervised Sommer for several years. Carroll, a former member of the BOP's intelligence arm (SIS) had a nearly omniscient view of Sommer's behavior, regularly monitoring his phone calls, email, letters, and other communication in the course of her duties. In her letter to the Court, Carroll wrote that "I have met many horrible, violent inmates while working for the BOP and was committed to seeing they never saw the outside world again, but this case is surely the exception. [Sommer] earned my compassion and respect. He fought all odds and maintained a positive attitude even knowing he may never see his family again." Additionally, Carroll stated, "I stake my reputation, integrity, and name on this young man. I believe he can and will make a difference in this world."

Supporting this transformation, Sommer's disciplinary record has similarly improved. He has been violence-free since his last conviction before this Court, a period of over thirteen years, and he has had no incident reports of any kind for more than three years. This is reflected in his custody scoring. While Sommer is a HIGH/MAX inmate due to training he received as an Army Ranger, he is now scored as a MEDIUM custody inmate for the first time since arriving in prison.

And finally, Sommer is addressing the trauma that defined most of his life by taking the Seeking Safety/Resolve program, a PTSD program that used Cognitive Behavioral Therapy, Cognitive Processing Therapy, and Dialectical Behavioral Therapy to help develop coping skills



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

without the use of drugs or alcohol. He has an extensive history of trauma, including witnessing major acts of violence, childhood sexual abuse. He is currently in the second phase of the Resolve program and "understands concepts and displays skills mastery." Seeking Safety/Resolve is allowing him to explore the connection between his substance use disorder and past traumatic events in his life. Sommer is no longer the rash young man he was. As predicted by modern neuroscience, Sommer has matured and aged out of criminal behavior.

## LEGAL STANDARDS

Under the First Step Act of 2018, defendants are no longer required to wait for the BOP to file a motion for compassionate release on their behalf. Pub. L. No. 115391, 132 Stat. 5194, 5239, §603(b) (Codified at 18 U.S.C. §3582(c)(1)(A)). Defendants may file their own motions after (1) exhausting administrative remedies for the Bureau's failure to file on such a motion, or (2) "30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). Sommer satisfied this requirement by submitting a request to the warden of his facility on 29JAN22, more than 30 days prior to the date of this filing. *Request to Warden*, Ex. 1.

This Court may grant a motion for compassionate release if, "after considering the factors set forth in section 3553(a) to the extent they are applicable," the Court finds that "extraordinary and compelling reasons warrant such a reduction," and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. §3582(c)(1)(A). The Ninth Circuit has held that "the current version of U.S.S.G. §1B1.13 is not an 'applicable policy statement[]' for 18 U.S.C. §3582(c)(1)(A) motions filed by a defendant." *United States v. Aruda* 993, F.3d 797, 2021 WL 1307884, at *4 (9th Cir. Apr. 8, 2021). The Ninth Circuit explained, "[t]he Sentencing Commission's statements in U.S.S.G. §1B1.13 may inform a district court's discretion


LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

for §3582(c)(1)(A) motions filed by a defendant, but they are not binding." Accordingly, the list of examples of extraordinary and compelling reasons in §1B1.13 is not exclusive, freeing the Court to consider any extraordinary and compelling reasons for release a defendant may raise.

As a result, the two issues before the Court are:

1. whether a sentence reduction is consistent with applicable sentencing factors, and
2. whether extraordinary and compelling reasons warrant such a reduction.

## ARGUMENT

### I. REDUCING SOMMER'S SENTENCE TO TWENTY YEARS IS CONSISTENT WITH 3553(A) SENTENCING FACTORS; ALLOWING SOMMER TO SERVE THE REMAINDER OF HIS SENTENCE IS NOT.

Sommer has already served nearly fifteen years in prison for offense conduct committed at age twenty and twenty-two. Incarceration beyond the requested twenty years would be greater than necessary to achieve the purpose of punishment. 18 U.S.C. §3553(a).

Under 18 U.S.C. §3553(a)(2), a sentence should be sufficient, but not greater than necessary" to:

- reflect the seriousness of the offense;
- promote respect for the law;
- provide just punishment for the offense;
- afford adequate deterrence to criminal conduct;
- protect the public from further crimes of the defendant; and
- provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

For Sommer, a sentence of twenty years satisfies each of these factors incarceration beyond that would benefit no one.

---

I.A. Sommer's current sentence overstates the seriousness of his offense and could undermine, rather than promote, respect for the law.

Rather than reflecting the seriousness of Sommer's conduct, his sentence considerably overstates the severity of his crimes because it is decades longer than the median federal sentence for more serious crimes. See *United States v. Jordan*, 2021 U.S. Dist. LEXIS 152673 (D. Nevada, 2021); *United States v. Redd,* 444 F. Supp. 3d 717, 723 (E.D. Va, 2020).

Sommer's was sentenced to 44 years in prison for his offense conduct. He understands his crimes were serious, and he regrets the pain he has caused his victims. But in comparison to other federal sentences, his sentence significantly overstates the seriousness of his offenses. For example, his sentence is over twice the median federal sentence for murder (19 years) and is roughly three times the median federal sentence for sexual abuse and kidnapping (15 and 14 years respectively). See *2020 Annual Report and Sourcebook for Federal Sentencing Statistics*, United States Sentencing Commission ("USSC")[1]. Such an extreme and lengthy sentence, if unaltered, could "promote not respect, but derision for the law" by suggesting that the law is "merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved." *Gall v. United States*, 552 U.S. 38, 54 (2007) (favorably quoting district court judge). And Sommer's sentence is unquestionably harsh. His 528-month sentence is 58 months longer than

[1] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

the average life expectancy of the average federal inmate (470 months). See again *2020 Annual Report and Sourcebook for Federal Sentencing Statistics*, USSC[2].

The Supreme Court has repeatedly recognized that "[t]here is a difference between homicide and other serious violent offenses against the individual. *Kennedy*, 554 U.S., at 438, 128 S. Ct. 2641, 2660, 171 L. Ed. 2d 525, 550. Serious nonhomicide crimes may be devastating in their harm . . . but 'in terms of moral depravity and of the injury to the person and to the public,' . . . they cannot be compared to murder in their 'severity and irrevocability.' *Id.*, at 438, 128 S. Ct. 2641, 2660, 171 L. Ed. 2d 525, 550 (quoting Coker, 433 U.S., at 598 97 S. Ct. 2861, 53 L. Ed. 2d 982 (plurality opinion)). This is because '[l]ife is over for the victim of the murderer,' but for the victim of even a very serious nonhomicide crime, 'life . . . is not over and normally is not beyond repair.' Ibid. (plurality opinion). Although an offense like robbery or rape is 'a serious crime deserving serious punishment,' *Enmund*, supra, at 797, 102 S. Ct. 3368, 73 L. Ed. 2d 1140, those crimes differ from homicide in a moral sense." *Graham v. Florida*, 560 U.S. 48 (2010).

There is no question that Sommer's crimes were serious, and that they demanded equally serious punishment. But as stated, his current sentence reflects appropriate punishment for crimes far more heinous this his. See *United States v. Fort*, 2021 U.S. Dist. LEXIS 82471 (N.D. Ca, 2021) (denying compassionate release to a defendant with a 496-month sentence for conduct that included the murder or two adults and an infant); *United States v. Banashley*, 2021 U.S. Dist. LEXIS 198284 (D. Arizona, 2021) (denying compassionate release where defendant serving a 504-month sentence had killed a federal officer, crushing his head with a rock); *United States v. Orr*, 2021 U.S. Dist. LEXIS 224475 (W.D. North Carolina, 2021) (denying compassionate release

[2] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

where the defendant was serving a 552-month sentence for conduct that included execution-style murders, robbery, and an attempted murder); *United States v. Slater*, 2020 U.S. Dist. LEXIS 136643 (E.D. California, 2020) (denying compassionate release to a defendant serving a 300-month sentence for nine bank robberies and two 924(c) convictions whose criminal history included first-degree murder and rape). All told, Sommer is serving 528 months, 32 months longer than the defendant in *Fort*, and all without killing anyone.

Unfortunately, the sentencing Court had little ability to decrease the severity of the sentence to better match the seriousness of Sommer's offense conduct. The 24 years Sommer received for his bank robbery was the result of an 11(c)(1)(C) binding plea agreement that tied the Court's hands. The best Judge Burgess could do was sentence Sommer to the bottom of the guideline range, *which he did*, giving him 87 months for the conspiracy, bank robbery, and explosives possession charges. The other 201 months was for his single count of 924(c). Similarly, this Court's discretion was limited by Sommer's second 11(c)(1)(C) plea for his assault and solicitation to commit a crime of violence charges. Fortunately, when ruling on Sommer's motion for Reduction in Sentence, this Court is no longer so restrained.

---

I.B. A sentence of twenty years is more than sufficient to deter anyone familiar with Sommer's case.

In the *United States v. Lopez*, 2020 U.S. Dist. LEXIS 200076 (D. Hawaii, 2020) the Court was satisfied that imprisonment "for close to a quarter century" (24 years) would serve to deter anyone from the heinous crimes Lopez was sentenced for (first-degree murder, aiding and abetting first-degree murder, and multiple drug offenses). Sommer's conduct, while extremely serious, falls well short of first-degree murder carried out in furtherance of a drug enterprise.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer received proceeds from the robbery, but was taken into custody within days and, beyond being required to pay restitution, his liberty has been restricted ever since. His assault and solicitation to commit a crime of violence charges resulted in additional time, a significantly elevated custody level, and subjected him to eleven months in the Special Housing Unit, largely in solitary confinement. It is difficult to imagine anyone familiar with these circumstances would conclude that Sommer's behavior was worthy of emulating. If there is such a person, they would likely be undeterred by any sentence.

Further, "[i]t appears doubtful that a lengthy sentence has much of a deterrent effect on the public". According to the Justice Department, "[r]esearch shows clearly that the chance of being caught is a vastly more effective deterrent than even the most draconian punishment." *National Institute of Justice, Five Things About Deterrence*, (May 2016)[3]; see also *Valerie Wright, Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment 92018, The Sentencing Project*, at 1 (Nov. 2010)[4], ("research to date generally indicates increases in the certainty of punishment, as opposed to the severity of punishment, are more likely to produce deterrent benefits."). See *United States v. Jordan*, 2021 U.S. Dist. LEXIS 152674 (D. Nevada, 2021).

---

I.C. Neither the public nor Sommer would benefit from a sentence exceeding twenty years.

Continued incarceration beyond twenty years is not necessary to protect the public because Sommer is not the same person he was when he committed his crimes in his early twenties.

[3] https://nij.ojp.gov/topics/articles/five-things-about-deterrencev

[4] https://www.sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

See *Bellamy v. United States*, 474 F. Supp. 3d 777 (E.D. Va, 2020) (reducing petitioner's sentence to time served in part because he "is clearly a different person . . . than he was at his involvement in these crimes at age 21"); *United States v. Jordan*, 2021 U.S. Dist. LEXIS 152673 (D. Nevada, 2021) (granting compassionate release in part because "[the defendant] appears to be a much different person than when he committed [his] crimes").

At the time of his crimes Sommer was twenty and twenty-two years old, with an extensive history of trauma coupled with mental health issues stemming from his adverse childhood experiences and exposure to combat.

Sommer's age at the time of the offense conduct matters because the part of the brain utilized in impulse control, emotional reactions, executive function, and decision making (specifically the prefrontal cortex) is not fully developed in men until age twenty-five on average. See *Youthful Offenders in the Federal System* (2017)[5], USSC.

Given their lower impulse control and less developed decision-making capabilities, younger defendants tend to be less culpable than older defendants, and less likely to respond to harsh punishments. Cf. *Miller v. Alabama*, 567 U.S. 471-72 (2012) (explaining that "transient rashness, proclivity for risk, and inability to assess consequences . . . lessened a child's 'moral culpability' and enhanced the prospect that, as the years go by and neurological development occurs, his 'deficiencies will be reformed'"(quoting *Roper v. Simmons*, 543 U.S. 551, 570 (2005))). This reasoning is not limited to juveniles. See *United States v. Johnson*, 2021 U.S. Dist. LEXIS 209833 (N.D. Ca, 2021). In 2010, the USSC amended the sentencing guidelines at 5H1.1 to say that age (including youth) may be grounds for a departure. Prior to this point, age had not been considered

[5] https://nicic.gov/youthful-offenders-federal-system-2017



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

^normally relevant in determining whether or not a departure was warranted. *Id.* See also *United States v. Ramsay*, 538 F. Supp. 3d 423 (courts should consider adolescent cognition at sentencing, including "[a]dolescents' immaturity, their susceptibility to peer influence, and their dependence," and "cannot simply treat anyone over 18 as an 'adult' for sentencing purposes but must inquire whether the [defendant] is still in many respects an adolescent." (citing *Roper v. Simmons*, 543 U.S. 551, 570, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)))

Recent studies related to adverse childhood experiences have shown that children exposed to trauma have an elevated risk of engaging in serious, violent, and chronic offending. For example, in *Johnson* the Court pointed out that "[s]ince Miller, broader recognition of the importance of the Adverse Childhood Experiences study (ACES) has greatly affected our understanding of crime among young adults. Research into ACES has shown that greater traumatic experiences in childhood correspond with riskier behavior and a greater likelihood of involvement in the criminal legal system. Our own probation department now submits ACES evaluations in presentence reports (an evaluation missing from Johnson's presentence report). ACES has general applicability for adults, but particular salience for understanding youth behavior. See e.g., ibid. Bryanna Hahn Fox et. al., Trauma changes everything: Examining the relationship between adverse childhood experiences and serious, violent and chronic juvenile offenders, 46 CHILD ABUSE NEGL. 16373 (Aug. 2015). See also Merrick MT, et. al. *Prevalence of Adverse Childhood Experience From the 2011-2014 Behavioral Risk Factor Surveillance System in 23 States*. 172 Jama Pediatr. 103844 (2018). " See also *United States v. DeJesus*, 2022 U.S. Dist. LEXIS 71936 (S.D.N.Y., 2022) (granting compassionate release based in part on the defendant's youth, traumatic upbringing, and staff support)."



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer was physically, sexually, and emotionally abused as a child. He felt abandoned by his family, ignored by his uncle and others at a point in his life where guidance was critically needed and left to deal with bullying on his own. He was "home schooled" by his father but not actually educated. Altogether, Sommer experienced seven of the nine recognized ACE factors. See ACES (adopting the shorthand deployed by the Court in Johnson). Not only did this place him in the tragically elite 3.7% of youth with six or more ACEs, it put him at a greater than 200% probability of being involved in the criminal justice system. *Id.* Beyond the heightened risk of criminal behavior, *ACEs* also significantly elevated Sommer's risk of health problems. ACE exposure has been linked to chromosome damage, skeletal fractures, ischemic heart disease, higher blood pressure, chronic lung disease, and early death. *Id.* These effects are exponential and indicate a dose-response effect: adults with four or more ACEs have twice the risk of stroke as an adult with three. *Id.* Sommer, as mentioned, has *seven* (emotional/physical/sexual abuse; physical/emotional neglect; witnessing household violence; household mental illness). *Id.* If the positive associations with criminality and poor health outcomes weren't enough, ACEs also predict psychopathology. *Id.*

And Sommer's extensive history with trauma was not confined to his childhood. A month after he turned eighteen Sommer was in Baghdad, Iraq with his Special Operations unit engaging in active warfare where his roommate was killed. Less than eighteen months later, while in Afghanistan, he lost many of his friends in Operation Redwing, one of the most brutal incidents in recent Special Operations history. He has been physically assaulted in prison twice. In *Childhood victimization and lifetime revictimization*, published in Child Abuse and Neglect 2008[6], Widom

[6] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2572709/



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

CS, et al. found that all types of childhood trauma (sexual, physical, and neglect) elevate the risk of lifetime re-victimization. This has proven true in Sommer's case. Beyond the horrific abuse Sommer experienced he also developed post-traumatic stress disorder ("PTSD") from his childhood and military experiences.

PTSD is positively associated with hippocampal volume reduction and hypoactivation of the ventromedial prefrontal cortex ("vmPFC"). See *Smaller Hippocampal Volume in Posttraumatic Stress Disorder: A Multisite ENIGMA-PGC Study: Subcortical Volumetry Results From Posttraumatic Stress Disorder Consortia,* published in Biol Psychiatry Journal, 2018[7]; *Emotion and cognition interactions in PTSD: a review of neurocognitive and neuroimaging studies*, Hayes J, et al., Frontiers in Integrative Neuroscience, 2012[8]. This type of damage is relevant because together the hippocampus and vmPFC mediate the ability to make moral judgments. See *Hippocampal Damage Increases Deontological Responses during Moral Decision Making*, McCormick C, et al., The Journal of Neuroscience, November 30, 2016[9]. It is well established in the literature that "[a] classic hallmark of vmPFC damage is altered moral decision making." *Id.* See also Ciaramelli E, et al., *Selective deficit in personal moral judgment following damage to ventromedial prefrontal cortex,* Social Cognitive Neuroscience, 2007[10]; Ciaramelli E, et al., *It is the outcome that counts! Damage to the ventromedial prefrontal cortex disrupts the integration of outcome and belief information for moral judgment*, Journal of the International Neuropsychological Society, 2012[11]; Koenigs M, et al., *Damage to the prefrontal cortex increases*

[7] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5951719/
[8] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3466464/
[9] https://www.semanticscholar.org/paper/Hippocampal-Damage-Increases-Deontological-during-McCormick-Rosenthal/528a03c797c33e051c3fd217729e49e16d7c5817
[10] https://www.ncbi.nlm.nih.gov/search/journals/101288795/
[11] https://pubmed.ncbi.nlm.nih.gov/22929298/



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

*utilitarian moral judgments*, Natural Library of Medicine, 2007[12]. Damage to the hippocampus results in reduced empathy, possibly due to a diminished ability to vividly construct another person's situation. See Beadle JN, et al., *Empathy in hippocampal amnesia*, Front Psychology Journal, 2013[13].

In short, *for reasons outside of Sommer's control*, he had a statistically elevated risk of becoming a criminal, experiencing serious health consequences, developing serious psychopathology, enduring hopelessness, and requiring treatment for substance abuse disorders.

Unfortunately, statistics won. Sommer committed multiple felonies, caught Hepatitis-C as a result of intravenous drug use related to severe opioid use disorder, developed PTSD and personality disorders, and struggled with suicidal ideation and hopelessness. If this were the end of his story, then Sommer (and anyone with similar experiences) would be best served in a hospital or prison setting. But it's *not*, and he *isn't*.

For one thing, Sommer is no longer in his early-to-mid-twenties. As a result, his brain has had the opportunity to complete its development. A good metric of this is Sommer's disciplinary history. While incarcerated Sommer has had fourteen incident reports. Perhaps tellingly he received nine in the first two-and-a-half years of his sentence, five over the course of the last nine years, and in the last three-and-a-half years he has had none of any kind. This perfectly matches the trajectory expected by our modern understanding of neuroscience: a gradual slowing—and eventual stop—of antisocial behavior as the brain develops and neurological adulthood sets in.

Aside from a 44-year sentence, Sommer also emerged from his neurological adolescence with a substance use disorder. To address this issue Sommer requested admission to the RDAP program.

[12] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2244801/
[13] https://pubmed.ncbi.nlm.nih.gov/23526601/



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

He was denied because of the length of his sentence. Determined to find help, Sommer enrolled in the Challenge program, a residential cognitive behavioral therapy ("CBT") program that addresses mental health and drug abuse issues. Sommer found his sobriety, bought into the program and has been praised by staff for the changes he has made and consequently described as an asset, role model, and mentor. Sommer also enrolled in the Resolve program, a trauma treatment program that uses CBT, cognitive processing therapy ("CPT"), and dialectical behavioral therapy ("DBT") to address psychopathology associated with trauma, such as PTSD.

Sommer's experience with Challenge/Resolve is important for multiple reasons. Primarily, it shows his proactive role in his own rehabilitation and treatment. Instead of simply attempting to avoid institutional misconduct, Sommer recognized that his behavior was detrimental to his future and his own wellbeing and looked for ways to understand and address it. And perhaps more importantly, CPT has been shown as an effective way of treating PTSD. See Kaczkurkin A, et al., *Cognitive-behavioral therapy for anxiety disorders: an update on the empirical evidence,* Dialogues in Clinical Neuroscience (2015)[14]. Sommer also took Selective Serotonin Reuptake Inhibitors ("SSRIs") for years. *Medical Records*, Ex 16. This is important because SSRIs increase blood flow to areas of the brain affected by PTSD and promote neurogenesis (regrowth of neurons). See Bremner J, *Traumatic Stress: effects on the brain,* Dialogues Clin Neurosci, 2006[15]. It was found that taking SSRI medication caused a restoration of lost hippocampal volume physically restoring damaged brain tissue. *Id.*

As a result, Sommer has addressed each of the elements that lead to his criminal misconduct. By virtue of aging, his brain completed its development reducing his impulsivity and increasing

[14] https://pubmed.ncbi.nlm.nih.gov/26487814/
[15] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3181836/



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

his appreciation for consequence. By taking SSRI medication, he restored blood flow to the impaired areas of his brain that impacted his ability to make moral judgments and display empathy. By taking evidence-based recidivism reduction classes in CBT, DBT, and CPT Sommer addressed his irrational thinking and trauma related psychopathology. In short, Sommer grew up. As a direct consequence his prosocial choices have led to years of continued sobriety and a better overall ability to function as a member of society.

Nothing highlights these changes more than the evaluations contained in his *Psychology Records* where he is described by the program coordinator as a role model for members of his community. J. Buie, his treatment specialist states that he is an asset to the community and his own treatment. He works as a suicide companion monitoring suicidal inmates held in medical observation cells, was recently hired as a psychology peer (one of only three inmates in the prison to hold this position) where he helps inmates struggling with serious mental health issues and has been assigned to live with an inmate with serious mental health issues. These are positions requiring significant trust and speak favorably to Sommer's growth and maturity.

Sommer's risk of recidivism is also measurably reduced by virtue of both his age at present and the degree of education he has earned since coming to the BOP. When Sommer entered BOP custody, he had no real education of any kind. Since, he has completed the GED and taken college and vocational classes, resulting in a 57% decline in his risk of reincarceration. *See 2020 Effects of Aging on Recidivism Among Federal Offenders (2015),* USSC[16].

There is no question that at the time of his offense Sommer was a threat to the public. But most of Sommer's behavioral issues stemmed from his youth, trauma, and psychopathology. He

[16] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

has aged and addressed the issues within his control. Consequently, Sommer is not the man he was. He is respected by staff and inmates alike and has demonstrated the prosocial behavior expected from inmates capable of successfully reintegrating into the community.

---

I.D. Reducing Sommer's sentence to twenty years would afford Sommer access to the educational, vocational, and other programming opportunities originally envisioned by the Court, but rendered unavailable by the length of his current sentence.

Placement in institutional programs is largely determined by the length of an inmate's sentence; many programs have limited capacity and priority is given to those preparing for imminent release. As a result, Sommer was unable to enroll in GED classes, instead having to study on his own with personally purchased materials until he could pass the pretests. At that point he was enrolled in the GED program in order to challenge the official exams. This is not uncommon. See *United States v. McDonel*, 2021 U.S. Dist. LEXIS 6401 (E.D. Michigan, 2021). Similarly, he was unable to take the culinary arts program because vocational training slots are awarded to people who will be able to use them in the near future. On rare occasions, opportunities become available; Sommer has been able to take two vocational programs (Computer Applications and Custodial Maintenance) over the course of the last fifteen years. These opportunities existed because he was employed by the prison education department as a tutor, and part of that responsibility is working with inmates enrolled in the various VT programs. This, again, highlights Sommer's degree of initiative; if he was not actively pursuing his education and rehabilitation, these opportunities would have been unavailable.

All of these restrictions would be lifted by a sentence reduction to twenty years. Sommer would have three to five years left to serve, and during that time he would be able to complete any or all of these programs. It would allow him time to complete his Bachelor of Science degree in



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Psychology and begin his Master of Science program. He would be able to complete reentry training and programming that is restricted to people with less than four years remaining on their sentence. While Sommer would be eligible for these things in due time, leaving him to wait aimlessly while he has already demonstrated incredible self-directed rehabilitative efforts would be a waste of his young life. Sommer and Society would both benefit from a more appropriate use of his time in line with the Court's original intent.

## II. SOMMER'S UNJUSTLY LENGTHY SENTENCE, HIS AGE AND MENTAL HEALTH AT THE TIME OF HIS OFFENSES, THE CONDITIONS OF HIS CONFINEMENT, FAMILY CIRCUMSTANCES, AND HIS EXTRAORDINARY REHABILITATION ARE ALL EXTRAORDINARY AND COMPELLING REASONS TO REDUCE HIS SENTENCE TO 20 YEARS.

---

### II.A. The unjustly lengthy nature of Sommer's sentence combined with his age, history of trauma, and mental health at the time of his offense conduct are extraordinary and compelling reasons for reducing his sentence to twenty years.

Courts have found that "the injustice of a defendant's lengthy sentence" may be considered in deciding a motion for compassionate release under §3582. See *United States v. Brooker*, 976 F. 3d 228 (2nd Cir. 2020); *United States v. McCreary*, 2021 U.S. Dist. LEXIS 64243 (D. Arizona, 2021) (granting compassionate release after finding that defendant's sentence was "dramatically longer than necessary or fair") (quoting *United States v. McCoy*, 981 F. 3d 271 (4th Cir. 2020)).

In considering whether a sentence is unjustly lengthy, Courts have considered the First Step Act's overall purpose of reducing the overly punitive effects of the statutory schemes that govern sentencing when determining whether extraordinary and compelling circumstances exist. Cf. *United States v. Marks*, 455 F. Supp. 3d 17, 36 (W.D.N.Y., 2020) ("[t]he First Step Act is instructive, in as much as it evidences Congress's intent to mitigate the harsh and sometimes unjust



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

effects of sentencing laws"); *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa, 2019) (pointing out that the purpose of the First Step Act was "to promote rehabilitation of prisoners and unwind decades of mass incarceration." (citing Cong. Research. Serv., R45558, The First Step Act of 2018: An Overview 1(2019))); see also Haynes, 456 F. Supp. 3d 496, 514 (considering harshness of sentences imposed on similar and even more severe criminal conduct today).

Chief Justice Robert's concurring opinion in *Graham v. Florida*, 560 U.S. 48 (2010) validates this latter approach. The Chief Justice stated (referring to Graham's sentence for a nonhomicide crime) that "Graham's life without parole sentence was more severe than the average sentence imposed on those convicted of murder or manslaughter, who typically receive under 25 years in prison." He went further stating that "[a]s the Court explained in *Solem*, 463 U.S., at 291, 103 S. Ct. 3001, 77 L. Ed. 2d 637, '[i]f more serious crimes are subject to the same penalty, or to less serious penalties, that is some indication that the punishment may be excessive."

As previously discussed, supra (I.A.), Sommer's offense conduct was serious and deserving of a serious sentence. Even so, his sentence overstates the severity of his conduct and when viewed against similar sentences awarded for inarguably more serious crimes, this disparity, and the injustice of his sentence in the face of his individual circumstances, becomes obvious.

Sommer's "'relative youth at the time of his sentencing' particularly supports compassionate release because his young age is coupled with an extremely long sentence.' *McCoy v. United States*, No. 2:03-CR-197, 2020 U.S. Dist. LEXIS 93730, 2020 WL 2738225 at *5 (E.D. Va May. 26, 2020) (granting compassionate release to a defendant who was a teenager with no relevant criminal history at the time of his offense and who had served over 17 years of his more than 35-year sentence). See *United States v. Maumau*, No. 2:08CR00758-TC-11, 2020 U.S. Dist. LEXIS 28392. 2020 WL 806212 at*5,7 (D. Utah, 2020) (granting compassionate release based in part on



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

the young age of the defendant who was twenty when arrested and twenty-four when sentenced)." *United States v. Lopez*, 2020 U.S. Dist. LEXIS 200076 (D. Hawaii, 2020). See also *United States v. Bryant*, 2020 U.S. Dist. LEXIS 75681 (D. Maryland, 2020); *Owens v. United States,* 2020 U.S. Dist. LEXIS 237901 (E.D. Va, 2020); *United States v. McDonel*, 2021 U.S. Dist. LEXIS 6401 (E.D. Michigan, 2021).

This understanding is supported by the Court's analysis in *United States v. Millan*, 2020 U.S. Dist. LEXIS 59955 (S.D.N.Y. 2020), stating, "Indeed, the legislative history of 18 U.S.C. §3582(c)(1)(A) indicates that lawmakers thought that 'extraordinary and compelling reasons' for a sentencing reduction should not be limited to medical condition, age, and family circumstances. In particular, recognizing parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction (after service of some period of incarceration) based on any number of 'circumstances:' The [Senate Judiciary] Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence*, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment."

In Sommer's case, he is young, his sentence is unusually long for his crimes, and the sentencing guidelines have changed. In 2010, after Sommer was sentenced, the 5H1.1 departure guideline was altered to say that age (including youth) may be the basis for a departure. This change replaced previous guidance that said age was not normally relevant when considering granting a departure. See *United States v. Johnson*, 2021 U.S. Dist. LEXIS 209833 (N.D.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

California, 2021). Additionally, as discussed below, Sommer was also suffering from a long history of trauma. Newly developed neuroscience shows that trauma impacts cognitive processes and is positively associated with psychopathology. *Id.* As a result of this new science, there is a high likelihood that Sommer would have qualified for a departure on the grounds of diminished capacity as well.

Sommer's extensive history of trauma is relevant because, as the Court pointed out in *United States v. Johnson*, 2021 U.S. Dist LEXIS 209833 (N.D. California, 2021) "greater traumatic experiences in childhood correspond with riskier behavior and a greater likelihood of involvement in the criminal justice system." Trauma also predicts psychopathology, hopelessness, and substance use. See *Childhood and Adult Trauma Experiences of Incarcerated Persons and Their Relationship to Adult Behavioral Health Problems and Treatment*, N. Wolff, J. Shi, (published in the International Journal of Environmental Research and Public Health, 2012)[17].

And Sommer's list of childhood trauma is extensive. He was molested as a child, beaten, psychologically and emotionally abused, neglected, abandoned, and bullied. At seventeen years old, Sommer joined the army where he served as an Airborne Ranger. His platoon was involved in some of the most serious ground combat experienced in the war on terror. He served in both Iraq (2004) and Afghanistan (2005), all before turning twenty. And the trauma did not stop when he arrived in prison—since his sentencing Sommer has been assaulted twice.

Beyond simply being horrific to experience, there have been serious consequences to this lifelong history of abuse. As a direct result of Sommer's childhood and combat experience he developed PTSD, which as discussed supra (I.C.) impacts the regions of the brain associated with

[17]https://www.researchgate.net/publication/228106252_Childhood_and_Adult_Trauma_Experiences_of_Incarcerated_Persons_and_Their_Relationship_to_Adult_Behavioral_Health_Problems_and_Treatment



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

moral judgment. So, not only was Sommer dealing with the impulsive recklessness of youth, but he was also dealing with hypoactivation of his vmPFC and volume reduction in his hippocampus, altering his personality, impairing his ability to make moral decisions, and depressing his ability to show empathy and, by extension, remorse. And these were wounds that were partially earned in service to the United States of America. It was in this emotional and psychological nightmare Sommer found himself when he made the decision to rob the bank. While Sommer is responsible for his own actions, and understands that he is still culpable, that culpability is drastically reduced on the grounds of age *alone*. When coupled with psychopathology that further impairs decision making and moral judgment, there can be no question that Sommer's situation is extraordinary and compelling. When viewed in the context of the choices he has made to seek treatment, and the incredible rehabilitative success he has found, it is more compelling still.

---

II.B.1 The conditions of confinement created by the ongoing COVID-19 pandemic are significantly harsher than those envisioned at sentencing, providing an additional ground for sentence reduction.

Courts have found that conditions created by the COVID-19 pandemic constitute extraordinary and compelling reasons for relief under section 3582. For example, in *United States v. Tucker*, 2021 U.S. Dist. LEXIS 158909 (S.D.N.Y., 2021) the Court found that "the time Mr. Tucker has served in prison has been much more onerous than the Court contemplated when it sentenced him. Accounting for the pandemic's impact on Mr. Tucker's conditions of confinement, 'the sentence [he] is now serving looks materially different from the sentence the court envisioned.'" (quoting *United States v. Garcia*, 505 F. Supp. 3d 328, 332 (S.D.N.Y., 2020).)



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer's housing units have been repeatedly quarantined, resulting in severely restricted access to outdoor recreation, educational and vocational classes, and other programming expected by the Court. Beyond scheduled programming, communication has been similarly restricted. Phone, email, and visitation access was also shut down to help prevent the spread of the virus.

Beyond quarantine, Sommer has spent over two years under COVID-19 restrictions which, as of May 2022, have not been completely lifted. During this period the institution has implemented a color system, with colors corresponding to different levels of restriction (GREEN least restrictive, RED being most restrictive). The majority of this time has been spent in RED phase, which restricts almost all programming and permits limited access to recreation. The various programs Sommer enrolled in (a class on the protestant reformation through Religious Services Department, his Resolve class for PTSD, classes for his Challenge cognitive behavior therapy programming, et.) have been canceled, suspended, or restricted. At the time of this writing (May 2022), Sommer's institution was still in RED phase. See *Psychology Records*, Ex. 11; *Miscellaneous*, Ex. 17.

Beyond the restrictions, "the fear of catching a once in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison." *United States v. McCrae*, 17 Cr. 643 (PAE), 2021 WL 142277. The COVID-19 virus has proven lethal against even people who are fully vaccinated (like Sommer) and take all appropriate available precautions, creating a level anxiety that was not anticipated by anyone, let alone this Court.

---

<u>II.B.2. Sommer's extreme distance from home, cost of communication, lack of access to visitation, and other family circumstances are extraordinary and compelling reasons supporting this motion for sentence reduction.</u>



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer is currently housed at the Federal Correctional Complex, United States Penitentiary II in Coleman, Florida. He is literally the farthest possible distance he can be from his home while remaining in the contiguous United States. Sommer's home in British Columbia, Canada is well over 2,400 miles away. Congress, recognizing the importance of family visitation, recommended that all inmates be housed within five hundred miles of their homes. See the First Step Act of 2018. Because of Sommer's HIGH/MAX custody (which he has for training he received in the military and not for institutional conduct), there are no appropriate facilities to his custody level within five hundred miles of his home. This makes visitation extremely difficult. On the single instance his mother was able to come visit, lockdowns and other institutional security measures permitted visitation on only one of the three available days, despite her having spent well over a thousand dollars to see her son. With the onset of COVID-19, not even that was possible; the Canadian border was shut down and all visitation was canceled. In *United States v. Qadar,* 2021 U.S. Dist. LEXIS 136980 (E.D.N.Y, 2021) the Court granted a compassionate release motion in part because of family circumstances that included the petitioner's prolonged separation from family and lack of access to visitation.

Like visitation, Sommer's communication is also hampered; phone calls to Canada cost $5.25 for a fifteen-minute call, while inmates with local family are able to call for as little $.90. Letters are also more expensive. The average inmate is able to write home for a single first-class stamp. Sommer's letters require three. As a result, he is able to send six letters to another inmate's twenty. For the duration of the pandemic phone calls are free, however over the course of the last thirteen years this disparity in cost has been a hardship borne by Sommer's family.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer acknowledges that these conditions are the result of his breaking the law, but they are one more factor weighing in favor of relief.

---

II.C. Sommer's rehabilitation despite his excessively long sentence constitutes an "extraordinary and compelling" reason that, while unable to justify sentence reduction on its own, can be considered with other grounds.

The Merriam-Webster Dictionary of Law (3rd Print. 2018) defines (definition 2B) "rehabilitate" as follows: to restore (as a convicted criminal defendant) to a useful and constructive place in society through therapy, job training, and other counselling.

Sommer has been rehabilitated.

There is a plethora of evidence supporting this. As a start, Sommer is no longer in his early-to-mid-twenties. As discussed supra (I.C), Sommer has had a chance for full neurological development to occur.

Sommer has also addressed his psychopathology with both appropriate medication and therapy. He has taken SSRIs to increase blood flow to his brain and promote neurogenesis, restoring areas impacted by PTSD and exposure to explosive overpressure. *Id. Medical Records*, Ex 16. He has also participated in CBT, CPT, and DBT programming which has been shown effective in correcting

irrational thinking and addressing PTSD. *Id.*

Sommer has pursued his education and developed long-term plans and goals for scenarios that include both early release or completion of his sentence as it stands. This not only shows long-term, goal-oriented planning that is often absent in impulsive, consequence-blind youth, it also measurably lowers his chances of recidivism. When Sommer completes his bachelor's degree, he will have a lower risk of reincarceration than a high school graduate in his sixties (7.4% v. 7.9%



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

respectively). See Effects of Aging on Recidivism Among Federal Offenders (2015), USSC. As it stands now, Sommer's risk of reincarceration is already 57% lower than it was at the commission of his crimes. To provide a general overview, Sommer is currently taking undergraduate classes from two universities. He is enrolled in a Psychology program (BS) from California Coast University while taking chemical, physical, and biological science classes from Thompson Rivers University. This will ensure Sommer can meet the requirements for the MD/PhD program he is interested in applying for in the event the Court rules favorably on this motion (Sommer has no criminal record in Canada and is eligible for licensure as a physician upon graduation from a qualifying undergraduate medical program). In the event the Court declines to grant Sommer's motion or chooses to provide a smaller reduction than requested, Sommer intends to complete his Master of Science in Psychology and work in the Challenge unit as a mentor while continuing to work towards his goal of becoming a medical doctor. Sommer will be in his late fifties when he is released from prison as his sentence stands, and while admission to medical school at that age is unusual, it is not unheard of. Unheard of or not, this multipath analysis and goal-oriented plan for his future reinforces his present level of maturity.

Sommer is respected by both staff and inmates and occupies positions of trust and responsibility in the day-to-day operations of his institution. He serves as an inmate companion monitoring suicidal inmates, a program former BOP Director Charles Samuels was particularly proud of. He is employed as a GED tutor and spends his free time working one-on-one with students who have been unable to register for formal classes on the basis of sentence length. In light of his growing level of maturity, staff confirmed him as a member of the Conflict Resolution Committee where he helps mediate disputes between inmates. Recently he was also given the position of Psychology Peer, one of only three inmates in the institution to hold this position. He is responsible



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

for working with inmates suffering from serious mental health disorders and providing them with accountability, support, and companionship. As a part of this assignment Sommer was assigned to live with a mentally ill inmate.

Sommer accepted this position knowing it would be challenging and require both patience and understanding. In these roles Sommer is seen by staff as an asset, mentor, and positive role model. This level of trust by staff is extraordinary; even among the other Challenge program participants this degree of confidence from staff is unusual, and there is no comparison at all with inmates from general population. See *Psychology Records*, Ex. 11; *Program Review*, Ex. 12; *BOP Program Statement* 5324.08 (Suicide Prevention Program)[#]; *Director's Letter*, Ex. 15.

All told, Sommer has completed in excess of 1,500 hours of programming including vocational training classes, certificate programs, college classes, psychological therapy programs, recreation classes, and religious services programs. He teaches the GED curriculum, facilitates reentry classes, volunteers in food service during religious holidays, and tutors inmates who are working through undergraduate programs of their own. Beyond the formal support Sommer provides for his peers through these institutionally sponsored programs, Sommer also provides substantial informal support to inmates, helping them deal with family problems and offering emotional and spiritual support as needed. See *Program Review*, Ex. 12; *Community Support Letters*, Ex. 10; *Inmate Support Letters*, Ex.9; *Miscellaneous*, Ex. 17.

These are significant accomplishments. However, the best evidence of his rehabilitation remain the evaluations, comments, and letters from various staff members who have observed Sommer over the years. Staff are in a unique position to evaluate inmate behavior; they have phone, email/mail, and camera records along with their own personal observations to draw from. This level of nearly omniscient supervision is heightened for the Psychology Services Department staff



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

whose offices are in Sommer's living unit. Beyond their advanced psychology training, these staff members also have a combined 160+ hours of observation each and every week. Their comments are telling. The Challenge Program coordinator, Dr. J. Babnew, wrote that "[Sommer] demonstrates healthy attitudes on a daily basis and implements this within his interactions with his peers in the community. He has been working on maintaining personal integrity by following the rules even outside of the program hours and as such has become a role model to many members of the Challenge community." J. Buie, the Skills Treatment Specialist assigned to Sommer wrote, "To date, Sommer's willingness to utilize these self-reflective tools demonstrates his ability to interact with others in a pro-social way that would be expected from a positive community citizen." He went on to say, "Sommer has received positive praise from both the program community and the treatment staff for his current level of enthusiasm, and understands that if he continues these healthy practices to include the use of supportive allies, he will have a very high likelihood of maintaining his sobriety even through difficult life events." Mr. Buie added that "[a]t the request of treatment staff, Sommer assists as a mentor within Clinical Treatment Teams, and formulates thorough and objective peer to peer treatment interventions as a result." Mr. Buie summarized Sommer's program contributions, writing, "[o]verall, Sommer is an asset in both his own treatment and to the community as a whole." Aside from these direct evaluations, Mr. Buie also noted Sommer's extensive community involvement with starting and maintaining the unit's leisure library, membership in the Conflict Resolution and Inspiration committees, and service as a psychology peer, mentor, leader, role model, and friend to new and existing members of the Challenge community. These comments speak to Sommer's profound changes, but most importantly, explicitly address the fact that Sommer's behavior is consistent with what is expected for successful community reentry.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Additionally, Dr. C. Brodehl (acting as the Challenge coordinator while Dr. Babnew was on leave), J. Buie, and S. Irrizary (another member of the treatment staff) praised Sommer for "putting recognizable effort into working through his personal roadblocks to treatment," highlighting his "notable personal progress" in "having the courage to break outside of his comfort zone and to try new and uncomfortable ways of making choices." Dr. Brodehl also assessed Sommer as having demonstrated "skill mastery" as regards the CBT skills taught in phase one of the Resolve program. See *Psychology Records*, Ex. 11.

Staff outside of the treatment environment also respect Sommer's character and work ethic. J. Bryant, a shift supervisor in the Food Services Department gave him an outstanding overall work evaluation for his volunteer work during the Passover holiday. Officers who supervised Sommer on his living unit report that Sommer is respectful and a model inmate. Mr. Rogers, Sommer's supervisor in the education department stated that Sommer is a "remarkable tutor," and a man of "noble character." Finally, Mercedes Carroll, a former SIS technician who spent 23 years in the BOP wrote that Sommer "freely offered to provide information to demonstrate his willingness to maintain the security and order of the institution even though providing this information would earn him nothing and to participate in this endeavor could cost him his safety and perhaps his life." Courts have found that cooperation can be used as evidence of rehabilitation. See *United States v. Rucker*, 2021 U.S. Dist. LEXIS 168693 (D. Kansas, 2021) (finding that "defendant's recent cooperation with federal authorities on multiple occasions - undertaken despite the lack of any promise from the government of support for reduced sentence and despite the risk of harm to his reputation in prison among [] his fellow inmates - provides evidence of his rehabilitation"). Carroll goes on to say that "I believe [Sommer] can and will make a difference in this world. I have met many horrible, violent inmates while working for the BOP and was committed to seeing that they



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

never saw the outside world again, but [Sommer's] case is surely the exception." To drive the point home, Carroll wrote, "I stake my reputation, integrity, and name on this young man." In *United States v. Rodriguez*, 492 F. Supp. 3d. 306, 2020 S.D.N.Y. the Court found "these letters—written by the unbiased people who have spent more time with [the defendant] than anyone else—to be powerful evidence of his rehabilitation." See *Mercedes Carroll Letter*, Ex. 3; *Program Review*, Ex. 12; *Bryant's Letter*, Ex. 6; *Roger's Memorandum*, Ex. 7; *Psychology Records*, Ex. 11.

His peers are similarly effusive in their praise. Jerimy Sneed credits Sommer with getting him interested in obtaining a university level education even though he is serving multiple life sentences for murder. In addition, he credits Sommer with literally saving his life when he collapsed and injured his neck. Tashid Reed, in a particularly poignant example, states ". . . I'm only serving a 143 month sentence. I will add a few more years on my sentence if it took that for him to be free." In all, more than a dozen inmates lent their support to Sommer's motion, further validating the opinions of staff.

The community is no less supportive. Sommer has dozens of letters unrepentantly supporting his efforts to reintegrate into society, and more than half of them come from members of his release community including former senior law enforcement officers, commissioned military officers, business owners, and teachers. Of these, most are members of his formal support network. See *Community Support Letters*, Ex. 10; *Release Plan*, Ex. 13.

Sommer's disciplinary record and psychology evaluations show a clear trajectory leading towards complete rehabilitation. In the first two-and-a-half years of his incarceration Sommer earned nine incident reports. In the nine years following, he earned five, and in the last three-and-a-half he has earned none of any kind. This follows the findings of modern neuroscience perfectly; a sharp decrease and eventual stop of antisocial behavior walking hand-in-hand with increases in



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

responsibility and personal growth. In the *United States v. Lopez*, 2020 U.S. Dist. LEXIS 200076 (D. Hawaii, 2020) the Court found that "[a]lthough Lopez's crimes were serious and violent, those crimes occurred more than two decades ago and "[n]othing in [his] prison disciplinary raises any concern about him have a continued propensity for violence." (quoting *United States v. Claussen*, 2020 U.S. Dist. LEXIS 131070 (E.D. Pa, 2020)). Similarly, Sommer has had no incidents of violence since his last appearance before this court, some thirteen years ago.

His psychology records indicate that Sommer has struggled with addiction, honesty, and a history of trying to justify his actions, all stemming from childhood trauma. However, they also show that as he was treated he began to make profound changes; he found his sobriety, embraced honesty and personal disclosure, and took ownership for his actions. Sommer's letter shows deep reflection on his behavior and remorse for his actions and paints a clear and candid picture of his growth as a man. In every aspect of Sommer's life, he has attempted to identify and address his blind spot issues, becoming a person that is highly respected by his community, inmate peers, and BOP staff.

"[R]ightly or wrongly, this country's criminal justice system is premised on the idea that a person can—and hopefully will—change after several years locked in prison." *United States v. Lopez*, 2020 U.S. Dist. LEXIS 200076 (D. Hawaii, 2020) (quoting *United States v. Ledezma-Rodriguez*, 2020 U.S. Dist. LEXIS 123539 (S.D. Iowa, 2020)). Sommer is clearly not the same man he was and has taken every opportunity to change available to him. Additionally, while rehabilitation on its own cannot be grounds for relief under §3582(C)(1)(A)(I), it can be considered along with other issues. In light of the above, Sommer respectfully submits that he has been rehabilitated.

<u>RELIEF REQUESTED</u>



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer respectfully requests a sentence reduction to twenty years (240 months), *and* that special conditions of supervised release be ordered in this case.

Because Sommer has dual citizenship, his release will require careful planning. His entire social support network is in Canada, and while Sommer lived in the United States as an adult he did so while serving in the military and living in barracks billeting. Since he is barred from returning to military installations and would be ineligible for housing there in any case, there is nowhere in the United States that he has community ties or a social support network. In Canada, however, he has a substantial network of family, friends, and invested community members as evidenced by the exhaustive collection of letters before the Court. Even so, Sommer would require the consent of the Court in order to return to Canada.

Sommer previously affirmed his oath of allegiance to the Canadian people and government as a measure to belay concern on the part of the Treaty Transfer board (International Prisoner Transfer Unit, Office of Enforcement Operations, Department of Justice) of his returning to the United States post-transfer (had he been granted a Treaty Transfer). See *Sommer's Loss of Nationality*, Ex. 14. This declaration of allegiance triggers forfeiture of Sommer's U.S. nationality under 8 U.S.C. §1481 upon his return to Canada. This would function in effect like an order of deportation: Sommer would leave the U.S. and no longer be able to legally return without the consent of the United States Government. As mentioned in *United States v. Lopez*, 2020 U.S. Dist. LEXIS 200076 (D. Hawaii), "to the extent there are lingering public safety concerns, these are mooted by the fact Defendant would be deported following release." (quoting *Ledezma-Rodriguez*, 2020 U.S. Dist. LEXIS 123539, 2020 WL 3971517, at *8.)

As a result, Sommer requests his conditions of supervised release be structured to permit him to obtain a passport and return to Canada to rejoin his family and integrate into his community.



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer recognizes the Court may feel a different period or incarceration or terms of supervised release may be warranted by the facts at hand. For this reason, he asks for whatever relief the Court feels appropriate in the light of his individual circumstances.

Sommer also acknowledges that the Court may find that reduction in sentence is not appropriate *at this time*. While Sommer feels confident he has met the bar required of him by §3582(C)(1)(A)(I), he recognizes that the Court will weigh his motion factoring in the government's response and other relevant factors, and may conclude differently. For this reason, Sommer requests that if the Court finds that circumstances do no warrant relief *at this time* that the Court deny without prejudice so that Sommer can renew his motion, and these arguments, in the future. See *Musa v. United States*, 502 F. Supp. 3d 803 (denying compassionate release without prejudice so that the defendant could continue his recent trajectory of good behavior for future consideration).

## CONCLUSION

Sommer was just twenty years old when he committed his robbery, suffering from serious mental health conditions that have persisted to this day. His over sentencing, exposure to deviant peers, and placement in a high security facility served not to deter him from criminal conduct, but instead contributed to him becoming a drug addict, adopting a nihilistic attitude, and building irrational thinking habits that led him to more serious offense conduct.

Sommer was, and is, responsible for his own behavior, and he has taken responsibility at every opportunity provided, but it is increasingly easy to see how this all came about when viewed through the lens of modern neuroscience. The most perplexing question in this entire affair was, "why?" and for years, there was little by way of answer. But now, with what we know about neurological development in young men—and what is openly recognized by the Supreme



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Court (through their decisions in *Miller v. Alabama*, 132 S. Ct. 2455 (2012) and *Graham v. Florida*, 560 U.S. 48 (2010)) and the Sentencing Commission (through their changes to the 5H1.1 sentencing guideline and the Youthful Offenders in the Federal System study)—we can see the progression of Sommer's thinking and behavior and recognize it as a result of his age, environment, trauma, and general lack of good role modeling and community intervention. The fact that Sommer has aged out of antisocial behavior, that he has pursued rehabilitation in the face of a sentence measured in decades while serving time with peers sentenced to much shorter sentences for more severe conduct, is in itself extraordinary. But coupled with the other factors presented herein, his situation becomes all the more compelling.

Sommer is no longer a threat to his community, his case is extraordinary and compelling, and the 3553(a) sentencing factors clearly weigh in his favor. Sommer respectfully submits that he has met the bar required by section 3582, and begs the Court for relief.

Dated this 16th day of June, 2022.

Respectfully Submitted

Luke Sommer

LUKE E. SOMMER
Pro-se petitioner



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

FILED LODGED
RECEIVED
JUN 21 2022
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

LUKE ELLIOTT SOMMER

Petitioner,

v.

UNITED STATES OF AMERICA,

Respondent.

NO. CR09-257JLR
NO. CR09-436JLR
NO. CR06-5528FDB
Judge Robart

## BRIEF IN SUPPORT OF ORAL ARGUMENTS

Sommer respectfully requests oral arguments regarding his motion for compassionate release on the following grounds:

1) The issues in this case are complex. As a result, oral arguments would give all parties involved the opportunity to emphasize and clarify key elements of their arguments.

2) Many of Sommer's arguments are predicated on the fact he is not the same man that he was at the time of his offense conduct and sentencing. While it may be possible to make that determination through the record, oral arguments would provide the Court the opportunity to evaluate Sommer and directly compare his behavior, attitude, and level of maturity at present against the same at the time of his last appearance before the Court. For this reason alone, oral arguments would be beneficial in this case.

Dated this 16th day of June, 2022.

Respectfully Submitted

Luke Sommer

LUKE E. SOMMER



LUKE E. SOMMER 38474-086
Pro Se Petitioner
USP # 2
P.O. BOX 1034
Coleman, FL 33521

Sommer, Luke Elliott 38474-086
United States Penitentiary #2
Federal Correctional Complex
P.O. Box 1034
Coleman, FL 33521
USA

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS. FOLD AT DOTTED LINE

**CERTIFIED MAIL**

7022 0410 0000 6628 7012

**PRIORITY ★ MAIL ★**

TRACKED ★★★ INSURED ★

UNITED STATES POSTAL SERVICE®

U.S. POSTAGE PAID
PM 2-Day
COLEMAN, FL
33521
JUN 17, 22
AMOUNT
**$0.00**
R2305K139876-09

1006

98402

35.38

Clerk of the Court
1717 Pacific A
Room 3100
Tacoma, Washington
98402, USA

FILED — LODGED
RECEIVED
JUN 21 2022
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY DEPUTY